Case 38—Election Contest for Governor and Lieutenant Governor of Kentucky—April 6.

# Taylor, &c., v. Beckham, &c.

Appeal from Jefferson Circuit Court, Common Pleas Division.

Action by William S. Taylor against J. C. W. Beckham, L. H. Carter, and John B. Castleman to enjoin defendant Beckham from attempting to act as Governor of Kentucky, and to enjoin defendant Castleman from attempting to act as Adjutant General of Kentucky, and to enjoin each of the defendants from interfering with plaintiff in the performance of his duties as Governor of Kentucky. Also action by John Marshall against J. C. W. Beckham and L. H. Carter to enjoin defendant Beckham from attempting to act as Lieutenant Governor of Kentucky, and to enjoin defendant Carter from attempting to preside over the Senate of Kentucky. Also action by J. C. W. Beckham against William S. Taylor and John Marshall praying that defendant Taylor be adjudged to have usurped the office of Governor, and that plaintiff be adjudged entitled to said office, and that defendant Marshall be adjudged to have usurped the office of Lieutenant Governor, and that plaintiff be adjudged the lawful incumbent of said office. Actions consolidated. Judgment declaring J. C. W. Beckham to be entitled to the office of Governor and L. H. Carter to be entitled to the office of Lieutenant Governor, and adjudging William S. Taylor has usurped the office of Governor, and that John Marshall has usurped the office of Lieutenant Governor, and William S. Taylor and John Marshall appeal. Affirmed.

Helm, Bruce & Helm, W. O. Bradley, W. H. Yost, D. W. Fairleigh, A. E. Willson, T. L. Edelen, W. H. Sweeney, and Breckinridge & Shelby, for appellants.

Lewis McQuown, W. S. Pryor, Zack Phelps, John K. Hendrick, Jas. A. Scott, and Kohn, Baird & Spindle, for appellees.

Power of Governor to Adjourn Legislature—Contested Election—Effect of Death of the Contestant for Governor on the Con-

Taylor, &c., v. Beckham, &c.

TINUATION OF THE CONTEST BY THE LIEUTENANT GOVERNOR—IM-
PEACHMENT OF LEGISLATIVE JOURNALS FOR FRAUD—SUPERVISORY
ACTION OF COURT—CONCLUSIVENESS OF LEGISLATIVE ACTION.

Held:    1. The Governor has no power over the time of adjournment
    of the two Houses of the Legislature, except in case of dis-
    agreement between them.   There being no disagreement between
    the two Houses, the attempt of appellant, Taylor, to adjourn the
    Legislature from January 31st to February 6th, was void and did
    not interfere with the right of that body to proceed with its
    sessions at Frankfort.

2. The death of Goebel did not affect the right of appellee Beck-
    ham.   If Goebel was elected Governor and Beckham Lieutenant
    Governor in November, Beckham, upon Goebel's death, February
    3d, became entitled to the office of Governor, and had the right
    to continue the contest to secure what the Constitution guaran-
    teed to him.

3. This court is without jurisdiction to go behind the record made
    by the Legislature as shown by its journals.   Such a record is
    entitled to every presumption in its favor, the same that the
    records of this court would be entitled to receive at the hands of
    the Legislature in a matter before it.   This court can not in-
    vade a co-ordinate and independent department of the Govern-
    ment.

4. The journals of the Legislature being silent as to what evidence
    was heard in the contest, it must be presumed that it did its
    duty and had such evidence as was satisfactory to it.

5. This court has no power to inquire into the sufficiency of the no-
    tice of contest or the fact as to whether the contest board was
    or was not fairly drawn.   Such board was only a preliminary
    agency to take evidence and report it, and the General Assembly
    itself determined the contest.

6. It is urged that under the specifications of the notice of contest, if
    all were true, the election was void, and the Legislature should
    have so determined.   We have no means of knowing that the
    General Assembly reached such a conclusion.   The presumption
    is in favor of its judgment, and when it found as a fact, that the
    contestants received the highest number of legal votes cast at
    the election, we are not at liberty to go behind its finding.

7. The office of Governor is created by the Constitution of this State,
    and the instrument creating it might properly provide how such
    officer should be elected and how the result of the election should
    be determined, and the State had the right to provide such
    agencies, and such mode of procedure, as it saw fit.   The provis-
    ions of the State Constitution do not abridge the privileges or im-

munities of citizens of the United States, and is not in conflict with the Federal Constitution. Such an office is not property, and in determining the result of an election no one is "deprived of life, liberty or property."

8. Whether the Legislature was right or wrong in its decision is not our province to determine. If the action of the Legislature can be invaded by the courts, then it is no longer an equal and independent branch of the Government. Judicial tyranny is no less tyranny, because couched in the forms of law.

W. O. BRADLEY, ATTORNEY FOR APPELLANT. HELM, BRUCE & HELM, W. H. YOST, D. W. FAIRLEIGH, A. E. WILLSON, T. L. EDELEN, W. H. SWEENEY, AND BRECKINRIDGE & SHELBY, OF COUNSEL.

It is contended by appellants:

1. The grounds of contest are insufficient.

2. The report of the committee, and the resolution adopting same are void for uncertainty.

3. The two Houses of the General Assembly had no jurisdiction to act except as provided by statute, and they have exceeded their jurisdiction under the statute, and hence their judgment is void.

4. If to reach the result proclaimed, the Legislature deprived any considerable number of voters of their suffrage, by holding that no election had been in fact held, it had no power to do anything more than decide that there was in fact no election held, and re-submit the matter to the people.

5. The legislative Journals affirmatively show that there was no presiding officer of the Senate at the time action was had, and that a majority of the Senate did not vote in favor of the resolution, and under these circumstances the judgment is void, because to make the action valid, a majority of all the members in both Houses must have voted in favor of the resolution.

6. If the proceedings of January 31st and February 2d were void, they could not be cured by the action of the body on February 6th. The motion to reconsider had been laid on the table, and the power of the body over it had ceased. Besides being void, it could not be ratified.

7. The resolution claimed to have been passed separately by the two Houses, and by joint assembly, was never presented to the Governor for his approval, and hence is void.

8. The Governor had authority to adjourn the Legislature. He alone was the judge of whether insurrection existed. This being true, all action of the Board of Contest and of the General Assembly is void.

Taylor, &c., v. Beckham, &c.

9. When the people saw proper in their organic law, to confer a ju-
dicial power on the legislative branch of the Government, they
did not intend to make it arbitrary or place it beyond control,
but intended it should be exercised under the same limitations
which govern the exercise of the like power by the judicial de-
partment of the government. The Legislature, having violated
every rule of procedure governing the trial, has attempted to
exercise arbitrary and absolute power and has in this way de-
prived the appellants of their privileges and immunities under
the Constitution, *their offices*, which are not only property, but
valuable rights of which they can not be deprived without "due
process of law," and hence such action conflicts with the fifth
and fourteenth articles of amendment to the Constitution of the
United States. If the exercise of such power under the circum-
stances stated, is in accordance with the State Constitution, then
that Constitution conflicts, in the respects pointed out, with the
Constitution of the United States, which is the supreme law of the
land, and it, as well as the whole action of the Legislature, is
void. Kentucky Constitution, sec. 70; Works on Courts and
Jurisdiction, 31; Wells on Jurisdiction, sec. 4; Grinstead v.
Scott, 82 Ky., 88; Rainey v. Ratcliffe, 81 Ky., 468; Lunsford v.
Culton, 15 L. R., 504; Cooley's Con. Lim., pages 780-1-2 (and
authorities cited); star pages 620-1-2 (5th ed.); Leeman v. Hin-
ton, 1 Duv., 38; Commonwealth v. Jones, 10 Bush, 725; Pendle-
ton v. Hocker, 100 Ky., 726; Cooley's Con. Lim., page 774 (star
page, 616), 5th ed.; Nall v. Tinsley, 21 Ky. Law Rep., 1167; Wil-
son v. Hines, 99 Ky., 221; Kentucky Statutes, sec. 2566; New-
cum v. Kirtley, 13 B. Mon., 517-18; Batman v. Megowan, &c.,
1 Met., 538; Lafferty v. Huffman, 99 Ky., 80; Cooley's Con.
Lim., 3d ed., sec. 79, page 86; State v. McBride, 4th Mo., 305;
Cooley's Con. Lim., 3d ed., secs., 135-6; 3 Am. & Eng. Ency.,
page 675; 23 Am. & Eng. Ency., page 193; State v. Field, 119
Mo.; Douglas v. Bank, 1 Mo., 24; State v. Mead, 71 Mo., 266;
State v. Ray, 109 Mo., 594; Wells v. Mo. Pac. Railway Co., 110
Mo., 286; *Ex parte* Howard-Harrison Iron Co., 24 So., 516;
Webster v. City of Hastings, 77 N. W., 127; People v. Detten-
thaller, 77 N. W., 450; State v. Hocker, 36 Fla., 358; Cohn v.
Kingsley, 49 Pac., 985 (38 L. R. A., 74); Union Bank of Richmond
v. Commissioners, 119 N. C., 214; (34 L. R. A., 487); Ames v.
U. P. Railway Co., 64 Fed. Rep., 165; Smith v. Chicago, &c.,
Ibid; Higginson v. Chicago, &c., Ibid; State v. Swan, 51 Pac.
R., 209; (4 L. R. A., 195); C. B. & Q. R. R. v. Chicago, 166 U. S.,
234; Jones v. Jones, 12 Pen. Stat., 350, (Am. Dec., 611); Mechem
on Public Officers, sec. 531; Auditor v. Cochran, 7 Bush, 1;
Sheafer v. Gates, 2 B. Mon., 457; Section 18, article 2, old Con-

stitution, sec. 36, present Constitution; Section 41 Kentucky Con_ stitution, sec. 23 art. 2, old Constitution; Howes v. Perry, 92 Ky., 13; sec. 148 Kentucky Statutes; Struss v. Johnson, 100 Ky., 326; Anderson v. Likens, vol. 20 Ky. Law Rep., 1001; Sawyer Case, 124 U. S., 210, 212, 220; Kinnard v. Louisiana, 92 U. S., 480; Foster vs. Kansas, 112 U. S., 201; Wilson v. North Carolina, 169 U. S., 594; Standeford v. Wingate, 2 Duvall, 440; Bailey v. Com., 81 Ky. 401; Cummings v. Missouri, 4 Wall., 221; Page vs. Hardin, 8 B. Mon., 672; Fletcher v. Peck, 6 Cranch, 137; Marbury v. Madison, 1 Cranch, Star page, 163; Windsor v. McVeigh, 93 U. S., 274; United States vs. Cruikshank, 92 U. S., 542-554; Leeper v. Texas, 139 U. S., 462-468; Scott v. McNeal, 154, U. S. 34.

HELM, BRUCE AND HELM FOR APPELLANTS.

1. Arbitrary power exists nowhere in a republic.
2. There is no ground of contest set forth in the notice of contest upon which the General Assembly had any right or authority or judisdiction to give the offices to the contestants.
3. The pretended judgment was merely the consummation of a conspiracy whereby it was agreed in advance, between the plaintiffs in the contest, and the triers thereof, that a judgment would be rendered in favor of the plaintiffs, and the pretended judgment is a mere mockery of justice.
4. The alleged judgment was not only fraudulent, but utterly void.
5. If the plaintiffs recover in this proceeding, they must recover on the strength of their own title and not on the weakness of their adversary. They must show a legal title to that which they demand. Toney v. Harris, 85 Ky., 453-464; Kentucky Constitution, Bill of Rights, sec. 2; Kelboam v. Thompson, 103 U. S., 168; United States v. Lee, 106 U. S., 196; Tindal v. Wesley, 167 U. S., 217; Jones v. Jones, 12 Pa. St., 350; Fletcher v. Peck, 6 Cranch, 86; Baxter v. Brooks, 29 Ark., 124; Grisel v. Marlow, 15 Ohio St.; Stine v. Berry, 96 Ky., 63; Windsor v. McVeigh, 93 U. S., 274; Newcum v. Kirtley, 13 B. Mon., 515; Hocker v. Pendleton, 100 Ky., 726; People v. Salmen, 46 Ill., 415; Leeman v. Hinton, 1 Duvall, 37; Wilson v. Hines, 99 Ky., 221; Com. v. Jones, 10 Bush, 725; Batman v. Megowan, 1 Met., 533; Mandeville v. Reynolds, 68 N. Y., 531-542; Freeman on Judgments, secs. 591 and 576; Slocum v. Sims, 5 Cranch, 363; Moses v. Julian, 45 N. H., 52, 84 Am. Dec., 114; Oakley v. Aspinwall, 3 N. Y., 549-550; Allsmiller v. Freuchtenicht, 86 Ky., 198; C. B. & Q. R. R. Co. v. Chicago, 166 U. S., 234; Wilson v. North Carolina, 169 U. S., 586; Hurtado v. California, 110 U. S., 536; Brown

v. Hummel, 6 Pa. St., 86; People v. Marx, 99 N. Y., 386; 16 Wall., 36; Story Miscellaneous Writings, 620; Cummings v. Missouri, 4 Wall, 277.

ZACK PHELPS, ATTORNEY FOR APPELLEES. LEWIS McQUOWN, W. S. PRYOR, JOHN K. HENDRICK, JAMES A. SCOTT, KOHN, BAIRD & SPINDLE, OF COUNSEL FOR APPELLEES.

1. This contest does not seek to have the whole election declared void, but only seeks to have it purged of illegal votes, so as to ascertain which candidate received "the highest number of legal votes," as provided by the statute, and on this question if the militia was used, it made "illegal" the vote cast or obtained under bayonet rule. Section 90, Constitution of Kentucky; Kentucky Statutes, secs. 1531 and 1596a; Wilson v. Hines, 99 Ky. Law Rep., 221; Nall v. Tinsley, 21 Ky. Law Rep., 1167; McCreary on Elections, secs. 550, 552, 553 and 554; Payne on Elections, secs. 467 and 473; Norris v. Hanley (Smith), page 60.

2. "Absolute and arbitrary power" must lie somewhere in determining these matters, and it is within the domain of the Legislature to so place it. Wilson v. State of North Carolina, 169 U. S., 585; Parnell v. Mann, 20 Ky. Law Rep.

3. Section 90 of the Constitution of Kentucky, expressly gives the Legislature the right and power to decide a contest for Governor and Lieutenant Governor, and section 39 of the Constitution confers the power on the Legislature to regulate this to suit itself. Varney v. Justice, 86 Ky., 596.

4. The Constitution by sections 27 and 28, provides that one branch of the government should not interfere with another branch of the government. Sections 27, 28, 63 and 109, Kentucky Constitution.

5. Even charges of "fraud" do not authorize courts to investigate, to annul or to set aside, where power is given to the Legislature to act. Carr v. Coke, 28 L. R. A., 737; State v. Jones, 23 L. R. A., 340; Blain County v. Herd, 45 Pac., 890; Wright v. Kelly, 43 Pac., 567; State v. Cardoza, 5 Rich, S. C., 312; Humboldt v. Churchill, 5 Nevada, 389.

6. The motives of the legislators can not be inquired into by the judiciary. It would be an endless, worthless, and most anomalous thing, to hear of courts taking *aliunde* evidence, with a view of attacking the doing or act of the Legislature. Indiana v. Kolsen, 14 L. R. A., 566; Stevenson v. Colgan, 14 L. R. A., 459; Lafferty v. Hoffman, 99 Ky., page 80; Commonwealth v. Shelton, 99 Ky., page 120; Commonwealth v. Hardin Co., 99 Ky., 188; Cooley on Con. Limitations, 163.

7. Parol evidence can never be used to attack the verity of the

journal of the legislative department. Ames v. Union Pac., 64 Fed. Rep., 167; Hughes v. Felton, 11 Col., 490; State v. Smith, 44 Ohio, 359.

8. The journals of the Legislature are its spokesmen and are conclusive. Robinson v. Smith, 10 N. E., 646; White v. Hinton, 30 Pac., 593; Spear v. The Mayor, 85 Ga., 49; Fentonville v. Woodhull, 25 Mich., 99.

9. A contesting board can pass upon the legality of votes, and reject such as are not legal. Clark v. McKenzie, 7 Bush, 524; Atchison & Co. v. Lucas, 83 Ky., 452; Stine v. Berry, 93 Ky., 63; Clark v. Rogers, 81 Ky., 43.


LEWIS McQUOWN Attorney for Appellees.

1. The tribunals for the trial of contested elections have exclusive jurisdiction. Batman v. Megowan, 1 Met., 533; Stine v. Berry, 96 Ky., 63; Brooks v. Baxter, 29 Ark., 194; Grisel v. Marlow, 15 Ohio St., 114; Stearns v. Wyoming, 53 Ohio St., 352; Section 90 Constitution of Kentucky; Newcum v. Kirtley, 13 B. Mon., 517; Reynolds v. Ouchita, 11 South. Rep., 236; Martin v. Mott, 12 Wheat, 19.

2. The journals kept by each house of the General Assembly import absolute verity, and may not be impeached or contradicted, on an allegation of fraud or mistake. Cooley's Con. Limitations, page, 223; McCullough v. State, 11 Ind., 430; Wright v. Defries, 8 Ind., 298; State v. Moffitt, 5 Ohio, 225; Wise v. Biggor, 79 Va., 269; Attorney General v. Rice, 64 Mich., 385; Jones v. Jones, 12 Penn. St., 350; Sunberry & Erie R. R. Co. v. Cooper, 33 Penn. St., 283; Fameling v. U. S., Freehold Co., 93 U. S., 644; United States v. Old Settlers, 148 U. S., 466; United States v. The Des Moines Co., 142 U. S., 544; Cohn v. Kingsley, 38 L. R. A., 78; Carr v. Coke, 28 L. R. A., 737; Blaine County v. Herr, 45 Pac. Rep., 890; State v. Cordoza, 5 Rich., 312; Humboldt County v. Churchill, 5 Nevada, 339; Grisel v. Marlow, 15 Ohio St., 114; Pangbaum v. Young, 32 N. J., 40.

3. The Governor has no power to adjourn the General Assembly, except there is a disagreement between the two houses as to the time for which they will adjourn. Constitution of Kentucky, secs. 29, 30, 41, 80, 89.

4. The provisions of the Kentucky Constitution and the statutes regulating the contest for Governor, afford due process of law. Kentucky Constitution, sec. 90; Kentucky Statutes, sec. 1531; Wilson v. North Carolina, 169 U. S., 586.

JUDGE HOBSON DELIVERED THE OPINION OF THE MAJORITY OF THE
COURT. A SEPARATE OPINION WAS DELIVERED BY JUDGE BURNAM,
CONCURRING WITH THE CONCLUSIONS OF THE MAJORITY, AND WHICH
WAS ADOPTED BY JUDGE GUFFY. ·
JUDGE DURELLE DELIVERED A DISSENTING OPINION.

At the November election, 1899, appellant W. S. Tay-
lor and William Goebel were opposing candidates for Gov-
ernor of Kentucky. Appellant John Marshall and appel-
lee J. C. W. Beckham were opposing candidates for Lieu-
tenant Governor. On the face of the returns, Taylor re-
ceived a majority of 2,383 over Goebel, and Marshall a
somewhat larger majority over Beckham. The State can-
vassing board, on the face of the returns, issued certifi-
cates of election to Taylor and Marshall. Goebel and
Beckham then gave notice of contest, and the matter was
brought before the General Assembly, which, under the
Constitution, is the tribunal to determine contests for these
officers; section 90 providing as follows: "Contested elec-
tions for Governor and Lieutenant Governor shall be de-
termined by both Houses of the General Assembly accord-
ing to such regulations as may be established by law."
The Statute passed pursuant to this provision of the Con-
stitution regulating the determination of such contests
is found in section 1596a, sub-sec., 8, Kentucky Statutes,
and provides that on the third day after the organization
of the General Assembly a board shall be chosen by lot,
and have power to send for persons and papers. Its de-
cision shall be reported to the two Houses, and the Gen-
eral Assembly shall then determine the contests. The Gen-
eral Assembly convened on January 2, 1900, and on the third
day after its organization, as shown by the journals of the
two Houses, a board of contest was appointed pursuant to
the statute. The journals also show that on February

2, 1900, the board in each of these contests reported to the
two Houses that they had heard all the evidence offered
by the contestants and contestees, and that William Goe-
bel had received the highest number of legal votes cast for
Governor; that J. C. W. Beckham had received the high-
est number of legal votes cast for Lieutenant Governor,
and that they were duly elected, and entitled to said of-
fices. The journals further show that on the same day
both Houses, with a quorum present, approved and adopted
separately and in joint session the reports of the contest
board, and declared that William Goebel and appellee J.
C. W. Beckham were duly elected Governor and Lieuten-
ant Governor at the election referred to.    Goebel and
Beckham were on that day sworn in accordingly.    On Jan-
uary 30th William Goebel was shot by an assassin, receiv-
ing a wound from which he afterward died on February
3d.    On January 31st appellant Taylor, as Governor, is-
sued a proclamation declaring that a state of insurrection
existed at Frankfort, Ky., adjourning the General Assem-
bly to February 6th, and ordering it to then assemble at
the town of London, in Laurel county.    The sessions of the
General Assembly on February 2d were not held at the
State house for the reason that it was held by a military
force of appellant, Taylor, that would not allow the as-
sembly to meet there, and for this reason met on that
day at the Capital Hotel, in the city of Frankfort.    On
February 19th the Legislature met again at the State house,
and the Senate on that day adopted the following resolu-
tion.    "Whereas, on the 31st day of January, 1900, the
acting Governor of the Commonwealth, of Kentucky, by
the use of armed force, dispersed the General Assembly,
and has until recently prevented the Senate and House
from assembling at their regular rooms and places of meet-

ing; and whereas, the General Assembly, and each House thereof, after public notice, met in joint and separate sessions in the city of Frankfort, a full quorum of such bodies being present, and adopted the majority reports and resolutions of the boards of contests for Governor and Lieutenant Governor of the Commonwealth of Kentucky, unseating the contestees, W. S. Taylor and John Marshall, as Governor and Lieutenant Governor, and seating the contestants, William Goebel and J. C. W. Beckham, as Governor and Lieutenant Governor, respectively, all of which proceedings, reports, and resolutions are set out in the journals of the two Houses of the General Assembly; and whereas, this joint assembly is now enabled to meet in its regular place of meeting, and whilst it adheres to the belief beyond doubt that the action of the General Assembly heretofore taken in reference to said contests is valid, final, and conclusive, to remove any doubt that may exist in the minds of any of the people of the Commonwealth:    Now, be it resolved, by the General Assembly of the Commonwealth of Kentucky in joint session assembled, to the end that all doubt may be removed, if any exists, as to the validity and regularity of the action and proceedings at the times and places shown by the journals of the two Houses other than its regular rooms, provided by law, that all the acts, proceedings, and resolutions of the Senate and House and of the joint assembly of the two Houses upon or touching the report of the majority of the boards of contest for the offices of Governor and Lieutenant Governor, unseating the contestees, and seating William Goebel and J. C. W. Beckham, and declaring them to have been elected Governor and Lieutenant Governor, respectively, on the 7th day of November, 1899, is hereby re-enacted, readopted, reaffirmed, and ratified at

Taylor, &c., v. Beckham, &c.

this, the regular place of meeting provided by law, at the seat of government in Frankfort, Ky.," This resolution, though not filed with the exhibits in these cases, is copied in the petition, and is admitted by the answer to have been entered on the Senate journal. The same resolution was adopted by the House, and by both Houses in joint session on February 20th.

Appellants insist that all these proceedings were void, and did not affect in any way their rights to the offices of Governor and Lieutenant Governor. A great many matters have been presented in the argument, but only such as seem decisive can be considered without unduly extending this opinion. It is insisted: (1) That the proceedings of the Legislature on February 2d are void, because the Legislature had then been adjourned by the Governor until February 6th, and no legal session could be held in the meantime. (2) That, Goebel having died on February 3d, the contest for the office of Governor thereby abated, and the action of the Legislature on February 19th and 20th was, therefore, void. (3) It is averred that the Legislature took no action on February 2d, and that the journals of these meetings were fraudulently made by the clerk, and pursuant to a conspiracy between certain members of the assembly and the contestants. (4) It is averred that the General Assembly acted without evidence, and arbitrarily. These contentions will be considered in the order stated.

1. As to the Governor's power to adjourn the Legislature. If the Governor had the power to adjourn the Legislature from January 31st to February 6th, of course no valid action could be taken by it in the interim. It is therefore necessary to determine whether he had such power. The only authority relied on to sustain his action is section 36 of the Constitution, which is as follows: "The

first General Assembly, the members of which shall be elected under this Constitution, shall meet on the first Tuesday after the first Monday in January, 1894, and thereafter the General Assembly shall meet on the same day every second year, and its sessions shall be held at the seat of government, except in case of war, insurrection or pestilence, when it may, by proclamation of the Governor, assemble, for the time being, elsewhere." At first blush it must strike any one that the thing in the mind of the framers of this section was not an adjournment of the General Assembly after it had assembled, but a provision for a place of assembling. Until an assembly is organized, it can not control its movements; and in case of an insurrection or pestilence preventing it from meeting at the capital it was necessary for some one to have power to name another place at which it might assemble for the time being, and organize. This seems, on its face, to be all the section was intended to provide for, and that it was not intended to authorize such action as was taken in this case is clear from section 80, which provides, among other things: "In case of disagreement between the two Houses with respect to the time of adjournment, he [the Governor] may adjourn them to such time as he shall think proper, not exceeding four months." From this provision it is clear that the Governor had no power over the time of adjournment of the two Houses, except in case of disagreement between them. There had been no disagreement between the two Houses here, and, if the Governor could have adjourned them from January 31st to February 6th, he might have made the time one month or four months, and then, by a similar proclamation, adjourned them again, and indefinitely prevented action upon the con-

test.   It is also to be observed that, while the Constitution
gives the Governor power with respect to the time of ad-
journment in case of disagreement between the two Houses,
it confers upon him no such power to name another place
than that in which the Legislature may be sitting.   Sec-
tion 41 provides:    "Neither House during the session of
the General Assembly, shall, without the consent of the
other, adjourn for more than three days, nor to any oth-
er place than that in which it may be sitting."   Under fa-
miliar rules of constitutional construction, either House,
by virtue of this section, may, with the consent of the
other, adjourn for more than three days, or to any other
place than that in which it is sitting.   It was never in-
tended by the Constitution that the two Houses might
name a time or place of adjournment, and that the Govern-
or could also have like power; for this would be not only
to create confusion, but to destroy the independence of the
legislative branch of the government.   By section 27, the
powers of a government are divided into three distinct and
independent departments, and by section 42 the regular
sessions of the General Assembly are limited to 60 leg-
islative days.   If the Governor can, without its consent,
adjourn it from time to time, or from place to place, as
he may see proper, he might be able to prevent it from
taking any action that he might be opposed to.   The leg-
islative branch of the government more nearly represents
the people than any other branch, and it is charged by the
Constitution and laws of this State with many important
interests directly affecting the people, to secure which
their independence of the executive is absolutely neces-
sary.   Section 41, above referred to, is taken literally from
the Federal Constitution.   After showing that Congress
is, with the single exception of a disagreement, between

the two Houses in respect of the time of adjournment, wholly independent of the President, Judge Story adds: "In no other case is the President allowed to interfere with the time and extent of their deliberations. And thus their independence is effectually guarded against any encroachment on the part of the executive." Story, Const., section 843. The reasons leading to the insertion of such a clause in the Constitution of the United States and in all the Constitutions of this State were the danger of executive control over the Legislature, and the fact that the colonial Governors exercised this power to destroy the effectiveness of the colonial Legislatures. We are clearly of the opinion that the State Constitution was intended to maintain the absolute independence of the legislative branch of the government; that the power claimed by the appellant Taylor is in conflict with both the letter and the spirit of the instrument, and that his attempt to adjourn the Legislature from January 31st to February 6th was void, and did not interfere with the right of the Legislature to proceed with its sessions at Frankfort.

2. As to the death of Goebel. The death of Goebel on February 3d did not affect the right of the appellee Beckham. If Goebel was elected Governor and Beckham Lieutenant Governor, in November, Beckham, upon Goebel's death on February 3d, became entitled to the office of Governor, and had the right to continue the contest to secure what the Constitution guaranteed to him. So that, if the Legislature had not acted until February 19th, it had a right then to act upon the contest, and its action would be none the less valid because not taken in Goebel's lifetime. But, as the legislative action of February 19th and 20th is assailed on substantially the same grounds as that on February 2d, this view of the case is not important, as

the question remains, was either action valid? This brings us to the consideration of the third point.

3. As to the validity of the entries in the journal, and the effect to be given them. It is alleged that the journals are fraudulent, the work of a conspiracy between the clerks of the two Houses, certain of the members, and the contestants, and that the facts shown by the journals as to the presence of the members of the two Houses, and the action taken by them, are untrue. The question is, therefore, can the court hear evidence of this character assailing the integrity of the legislative journals? Section 40 of the Constitution provides: "Each house of the General Assembly shall keep and publish daily a journal of its proceedings; and the yeas and nays of the members on any question shall, at the desire of any two of the members elected, be entered on the journal." The journal of each House of the General Assembly, kept pursuant to this provision of the Constitution under the supervision of the House, is, when approved by the House, not the act of the clerk, but the act of the House itself, and is entitled to the same respect as any of its other official acts. So far as we have seen, the authorities are uniform that evidence can not be received in court to impeach the verity of the record provided by the Constitution as evidence of the legislative proceedings. Thus, in Cooley, Const. Lim. p. 220, it is said: "And although it sometimes has been urged at the bar that the court ought to inquire into the motives of the Legislature where fraud and corruption were alleged, and annul their action if the allegations were established, the argument has in no case been acceded to by the judiciary, and they have never allowed the inquiry to be entered upon. The reasons are the same here as those which preclude an inquiry into the

motives of the Governor in the exercise of a discretion
vested in him exclusively. He is responsible for his acts
in such a case, not to the court, but to the people." In
Wright v. Defreese, 8 Ind. 298, which was a *quo warranto*
proceeding, involving the exercise of a franchise under an
act of the General Assembly, it was alleged that the act
was secured by fraud, corruption, and bribery. The court
refused to hear the evidence. It is said: "The powers
of the three departments are not merely equal. They are
exclusive in respect to the duties assigned to each. They
are absolutely independent of each other. It is now pro-
posed that one of the three powers shall institute an in-
quiry into the conduct of another department, and form
an issue to try by what motives legislators were governed
in the enactment of a law. If this may be done, we may
also inquire by what motives the executive is induced to
approve a bill or withhold his approval, and, in case of
withholding it corruptly, by our mandate compel its ap-
proval. To institute the proposed inquiry would be a di-
rect attack upon the independence of the Legislature, and
a usurpation of power subversive of the Constitution."
A similar question was presented in McCulloch v. State,
11 Ind., 424, where not only fraud, corruption, and brib-
ery were alleged, but also that one member of the assem-
bly, whose vote was recorded in the affirmative, in fact
voted in the negative, and that, without his vote, the bill
did not receive a constitutional majority. The court said:
"The facts thus alleged raise the question whether the
journals of the Houses of the General Assembly can be
contradicted or impeached on the ground of mistake or
fraud. The affirmative of this inquiry can not, in our opin-
ion, be maintained. Article 4, section 12, of the Constitu-
tion requires each House to keep a journal of its proceed-

ings, and publish the same. This journal must be held conclusive evidence of the facts which appear on its face, because it must be presumed that the members, as a body, inspected it, and made all necessary corrections, before they allowed it to assume the character of a journal of their proceedings. As well might evidence be received to contradict a statute, to show that it contained certain provisions inserted through mistake, as to contradict an entry made upon the journal. The House keeping the journal is the only tribunal by which it can be corrected, and, until corrected by such authority, it must be considered conclusive as to the facts which it contains. State v. Moffitt, 5 Ohio, 358; Turley v. Logan Co., 17 Ill., 151. We must, therefore, hold that the members alleged to have been absent when the bill passed over the Governor's veto were present and voted as averred in the journal, and that McMurray did vote in favor of the bill on its final passage in the House." In the case of State v. Moffitt, 5 Ohio, 358, above referred to, the question was whether Lemuel Moffitt had been elected judge of the Common Pleas court by the General Assembly. The Senate journal showed his election by the Senate, but the House journal showed the election of Samuel Moffitt. Depositions from members and officers of the General Assembly were offered to prove that Lemuel and not Samuel Moffitt was the individual actually voted for and elected in the House, but the court held the evidence inadmissible to impeach the journal, and that Lemuel Moffitt was not entitled to the office. The court said: "In the ninth section and first article of the Constitution it is required that each House shall keep a journal of its proceedings and publish them. This journal when taken in connection with the

laws and resolutions, would seem to be the appropriate evidence of legislative actions. It is not the action of a single member of the Legislature of which I speak, but of the whole body of the General Assembly. The former might, with propriety, be proven by parol testimony, but the latter is evidenced by evidence of a higher nature. The testimony of an individual member could not be received to contradict a statute, and, if not, why receive it to contradict an entry upon the journal?" In Wise v. Bigger, 79 Va., 269, it was alleged that only nineteen Senators voted aye on the passage of the bill, and that it did not receive, in fact, the affirmative vote of two-thirds of the senators present, and never became a law, although the contrary appeared on the Senate journal. The court said: "In the face of this solemn record, in which the Senate of Virginia certifies its proceedings, in a matter of fact, relating to its own conduct, in the apparent performance of its legal functions, this court is asked to inquire into or dispute the veracity of that certificate. To do this would be to violate both the letter and the spirit of the Constitution; to invade a co-ordinate and independent department of the government, and to interfere with the separate and legitimate power and functions of the Legislature." In a similar case the supreme court of Pennsylvania also said, where fraud and corruption were charged on the Legislature, and the court was asked to hold its action void for this reason: "We can not hesitate a moment on this question. We have no such authority, and ought not to have. However far the Legislature may depart from the right line of constitutional morality, we have no authority to supervise and correct their act on the mere ground of fraudulent or dishonest motives. We know of no such check upon legislation, and would not

desire to see such a one instituted. The remedy for such an evil is in the hands of the people alone, to be worked out by an increased care to elect representatives that are honest and capable. If the judiciary have such authority, then every justice of the peace is competent to sit in judgment upon every act of legislation which disorderly moralists or knavish or ignorant anarchists may choose to charge as fraudulent. Nay, more, if the question may be raised in a judical proceeding, the judges and justices of the peace will be bound to investigate and decide it, and the principal judicial business then might become that of testing, not cases by the standard of the law, but the standard itself by the infinitely various and uncertain judicial notions of morality." (Sunberry & Erie R. R. Co., vs. Cooper, 33 Penn. Stat., 283.) Any number of similar quotations may be made from other State courts. The decisions are all uniform. The same rule has been applied by the United States supreme court. Fletcher v. Peck, 6 Cranch, 87, (3 L. Ed., 162); *Ex parte* McCardle, 7 Wall., 506, (19 L. Ed.. 264); U. S. v. Old Settlers, 148 U. S., 466, (13 Sup. Ct. 650), (37. L. Ed., 509); U. S. v. Des Moines Nav. & Ry. Co. 142 U. S., 544, (12 Sup. Ct., 317), (35 L. Ed., 1109). In the case last cited the court said that: "The knowledge and good faith of a Legislature are not open to question. It is conclusively presumed that a Legislature acts with full knowledge, and in good faith."

The learned counsel for the appellants do not question the soundness of these decisions, but seek to distinguish them from the case before us on the ground that appellants have a pre-existing right, and that the rule referred to only applies to legislative acts operative for the future. But none of the cases rest on this ground. The ground

of all the decisions is that the judiciary have no power to sit in judgment upon the motives of an independent branch of the government, or to deny legal effect to the record of its action solemnly made by it pursuant to the Constitution. If this were allowed, it would soon follow that the independence of the Legislature would be destroyed altogether. When our system of government was formed, not a few publicists pronounced it impracticable, and foretold that sooner or later one of the three equal departments of the government would overshadow and supervise the others. So far these prophecies have proved groundless, but, if the contention of the appellants were sustained, this court would, in substance, assume supervisory power over the action of the Legislature and, as our jurisdiction is only appellate, the same power might be exercised by every subordinate court in the State in cases within its jurisdiction.

The Constitution of this State creates the offices of Governor and Lieutenant Governor. It provides how they shall be filled by election. It also provides how the result of that election shall be determined. In each of the four Constitutions of this State the General Assembly has been made the exclusive tribunal for determining this matter. This shows a clear and settled purpose to keep this political question out of the courts. We have no more right to supervise the decision of the General Assembly in determining the result of this election than we have to supervise the action of the Governor in calling a special session of the Legislature, or in pardoning a criminal, or the action of the Legislature in contracting debts, or determining upon the election of its members, or doing any other act authorized by the Constitution. There is no conflict between the action of the State canvassing board

and that of the Legislature in these cases.    The State canvassing board were without power to go behind the returns.    They were not authorized to hear evidence, and determine who was in truth elected, but were required to give a certificate of election to those who, on the face of the returns, had received the highest number of votes. For the State board to have received evidence to impeach the returns before them would have been for them, in effect, to act as a board for trying a contested election; and if they had done this, they would have usurped the power vested in the General Assembly by the Constitution, for by its express terms only, the General Assembly can determine a contested election for Governor and Lieutenant Governor.    But the certificate of the State board of canvassers is no evidence as to who was in truth elected. Their certificate entitles the recipient to exercise the office until the regular constitutional authority shall determine who is the *de jure* officer.    The rights of the *de jure* officer attached when he was elected, although the result was unknown until it was declared by the proper constitutional authority.    When it was so declared, it was simply the ascertainment of a fact hitherto in doubt or unsettled.    The rights of the *de facto* officer, under his certificate from the canvassing board, were provisional or temporary until the determination of the result of the election as provided in the Constitution; and upon that determination, if adverse to him, they ceased altogether.    Such a determination of the result of the election by the proper tribunal did not take from him any pre-existing right, for, if not in fact elected, he had only a right to act until the result of the election could be determined.    We are therefore unable to see how this case can be distinguished from any other legislative action taken in a matter over which the Constitution has

Taylor, &c., v. Beckham, &c.

given the Legislature exclusive jurisdiction, and are, there-
fore, of the opinion that the courts are without jurisdic-
tion to go behind the record made by the Legislature un-
der the Constitution. Such a record seems to us entitled
to every presumption in its favor that the records of this
court kept under its supervision would be entitled to re-
ceive at the hands of the Legislature in a matter before it.

4. As to the action of the Assembly being void be-
cause without evidence and arbitrary. The report of the
contest board to the General Assembly shows that it heard
the evidence offered by the contestants and contestees,
but the report does not, on its face, show that the evidence
taken by the board was submitted by it to the General As-
sembly. The journals also fail to show this fact. It is
insisted that therefore the General Assembly acted with-
out evidence in determining the contest. But there is a
clear distinction between the failure of the journal to
show a fact where the journal is merely silent on the sub-
ject, and a fact expressly shown in the journal. Here the
journals are only silent as to what evidence the General
Assembly heard, and, as it was a question requiring evi-
dence for its proper determination, it must be presumed
that the Legislature did its duty, and had before it such
evidence as was satisfactory to it. Thus, in Cooley on
Constitutional Limitation, it is said, in disposing of the
question of the constitutional power of the Legislature;
"In any case in which this question is answered in the
affirmative the courts are not at liberty to inquire into the
proper exercise of power. They must assume that the
legislative discretion has been properly exercised. If evi-
dence is required, it must be supposed that it was before
the Legislature when the act was passed, and, if any
special finding was required to warrant the passage of

the particular act, it would seem that the passage of the act itself might be held equivalent to such finding." Cooley, Const. Lim., p. 220. In McCulloch v. State, 11 Ind., 433, the court well said: "Presumptions are often indulged in support of the proceedings of courts, and it would be difficult to perceive why their proceedings should be entitled to more favor than those of the Legislature. It has been repeatedly decided that, where the record of a court possessing general powers is silent as to whether a party defendant had notice of suit, it will be presumed that the steps necessary to give jurisdiction of the person were properly taken. There is, indeed, no reason why legislative records should be more full and perfect than judicial." In those States where the enrolled bill is not held conclusive, it is uniformly held, where the journals are merely silent, that the presumption is absolute that the required steps were in fact taken. Lafferty v. Huffman, 99 Ky., 88, (35 S. W., 123), (32 L. R. A., 203). Under these principles it must be presumed that the Legislature in the case before us did its duty. A copy of the proof taken before the contest board has been filed with this record, comprising about 1,700 tyewritten pages. Of course, it is not presumed that each member of the Legislature read all this. It is only meant that the Legislature should learn the facts of the case from those appointed for that purpose, for this is all that is practicable in such bodies. There is nothing in the record before us to raise the presumption that this was not done.

It is also insisted that the notice of contest was insufficient, and that the evidence was equally insufficient; but these were matters to be determined by the Legislature, which the Constitution has made the sole tribunal to determine such a contest. Whether their decision in these

matters was right or wrong we have no power to inquire. In the distribution of the powers of the government certain power was, by the Constitution, assigned to the courts, and other powers to the General Assembly. For us to attempt to review its action would be as improper as for it to interfere in a case that this court had decided. It is said, that, if this is true, great injustice might be done by the Legislature. To this the supreme court of Indiana, in Evans v. Brown, 30 Ind., 514, responded thus: "Public authority and political power must, of necessity, be confided to officers, who, being human, may violate the trust reposed in them. This perhaps can not be avoided absolutely, but it applies to all human agencies. It is not fit that the judiciary should claim for itself a purity beyond others; nor has it been able at all times with truth to say that its high places have not been disgraced. The framers of our government have not constituted it with faculties to supervise co-ordinate departments, and correct or prevent abuses of their authority. It can not authenticate a statute. That power does not belong to it. Nor can it keep the legislative journal. . . . It is neither modest nor just for judges thus to impeach the integrity of another department of government, and to claim that the judiciary only will be faithful to its obligation." Speaking of contested elections for public office, this court, in Batman v. Megowan, 1 Metc., 538, said: "The law has designated the manner in which such questions shall be ascertained and determined: A board is to be constituted as prescribed by the statute to examine the poll books and issue certificates of election. Another board is to be organized in the case of a contested election for determining the contest between the claimants. Upon this last-mentioned board the law devolves the duty

and confers the power of deciding who is entitled to the office. The courts have no right to adjudicate upon these questions, or to decide such contests." In the later case of Stine v. Berry, 96 Ky., 63, (27 S. W., 809), this court again said: "We understand, and so adjudge, that the statute in regard to contested elections for State and county officers is exclusive. . . . Such statutes are enacted with remedies providing for the speedy determination of such questions, and to take from the courts all original supervisory power over such contests." See, also, Anderson v. Likens (Ky.) 47 S. W., 867; Booe v. Kenner (Ky.) 49 S. W., 330. This whole subject was fully examined in the case of Baxter v. Brooks, 29 Ark., 173, which was, like this, a contest for the office of Governor. The court said: "The office of Governor does not exist by virtue of the common law. It is a creation of the Constitution. And it is well settled that where a new right, or the means of acquiring it, is conferred by a Constitution or a statute, and an adequate remedy for its infringement is given by the same authority which created the right, the parties injured are confined to the redress thus given." In a review of this contest, quoted in this opinion, Judge Cooley said (page 186): "To our mind, there can be no plausible suggestion that the decision of the General Assembly on such a contest is open to judicial review afterwards; but it may not be inappropriate to refer to Grier v. Shackleford, 2 Tread. Const., 642; Batman v. Megowan, 1 Metc., 533; State v. Marlow, 15 Ohio St., 134; People v. Goodwin, 22 Mich., 496,—as in point."

It is also argued that the contest board was not fairly drawn by lot; that certain of the board were liable to objection on the score of partiality, and that, therefore, this board was not properly constituted. If any of these ob-

jections were well founded, the General Assembly had
full power to take such action as was proper in the prem-
ises.   It does not appear that any of the objections urged
were presented to the General Assembly, but, if they
were, and it refused to make a correction, it must be
presumed that it had sufficient reasons for its action.   Be-
sides, the board was only a preliminary agency to take •
evidence, and report the facts to the General Assembly.
The Assembly itself finally determined the contest.

It is also urged that under the specifications of the
notice of contest, if all were true, the election was void,
and the General Assembly should have so determined.
But we have no means of knowing that the General Assem-
bly reached such a conclusion.   The presumption is in
favor of their judgment, and when they have found as a
fact that the contestants received the highest number of
legal votes cast at the election in controversy we are not
at liberty to go behind their finding.   In Com. v. Jones,
10 Bush, 725, the board found that Jones had accepted a
challenge to fight a duel, and was, therefore, disqualified
to hold office.   But as, under the Constitution, a conviction
of the offense was necessary to disqualify Jones from hold-
ing office, this court disregarded the finding of the board,
for the reason that it related only to an immaterial mat-
ter.   In this case, however, the Legislature finds the fact
that determines the rights of the parties.   There is noth-
ing in their finding to show the election was void, and,
as we can not go behind it (10 Bush, 747, 748), the cases
of Leeman v. Hinton, 1 Duv., 38, and Hocker v. Pendle-
ton, 100 Ky., 726, (39 S. W., 250), have also no application.

It is also insisted that the legislative proceedings are in
violation of the fourteenth amendment to the Constitu-
tion of the United States, which provides:   "No State shall

make or enforce any law which shall abridge the privileges
or immunities of citizens of the United States, nor shall
any State deprive any person of life, liberty or proper-
ty, without due process of law." The office of Governor
being created by the Constitution of this State, the instru-
ment creating it might properly provide how the officer
was to be elected, and how the result of this election
should be determined. The provisions of the Constitu-
tion on this subject do not abridge the privileges or immun-
ities of citizens of the United States. Such an office is not
property, and in determining merely the result of the elec-
tion according to its own laws the State deprives no one
of life, liberty, or property. In creating this office the
State had a right to provide such agencies to determine
the result of the election, and it had a right to provide such
a mode of procedure as it saw fit. It is wholly a matter
of State policy. The people of the State might, by an
amendment to their Constitution, abolish the office alto-
gether. The determination of the result of an election
is purely a political question, and, if such suits as this
may be maintained, the greatest disorder will result in
the public business. It has always been the policy of our
law to provide a summary process for the settlement of
such contests, to the end that public business shall not
be interrupted; but, if such a suit as this may be main-
tained, where will such a contest end? To illustrate,
section 38 of the State Constitution provides: "Each
House of the General Assembly shall judge of the qualifica-
tion, elections and returns of its members, but a contested
election shall be determined in such manner as shall be
directed by law." Whatever inherent power either House
might have had to determine the election of its members
if the Constitution had been silent, its power under this

section is limited to the grant.  It will be observed that the phraseology is substantially the same as section 90, relating to contested elections of Governor and Lieutenant Governor.  Suppose these suits had been brought by two members of the General Assembly, alleging, in effect, the same facts as are alleged in this case, would any body suppose that the judiciary of the State would have the power to go behind the legislative journals, or to supervise the propriety of the legislative action, in determining the election of its members?  Could a member of the General Assembly, who had received a certificate from the canvassing board, and been afterwards ousted from the House to which he belonged on a contest, allege and show that the House had acted arbitrarily, depriving him of a pre-existing right, and denying to him the emoluments of the office for the term?  Could it be maintained that such action by either House of the General Assembly violated any protection afforded him by the Constitution of the United States, or that for this cause the action of the State authorities under the State Constitution, by virtue of which he claimed to have been elected, might be overruled?  This question was presented to the United States Supreme Court in Wilson v. North Carolina, 169 U. S., 586, (18 Sup. Ct., 435), (42 L. Ed., 865), where an officer arbitrarily removed from office applied to that court for redress.  His case was dismissed for want of jurisdiction.  If the State may arbitrarily remove an officer once appointed, we see no reason why it may not provide such means as it sees proper for the determination of its own elections.  If it has not such power, then its sovereignty as a State exists only in name.  The Congress of the United States has, by the Constitution, the power

Taylor, &c., v. Beckham, &c.

to judge of the qualifications, elections, and returns of its members. In not a few cases it has been supposed to have acted arbitrarily in such matters, but it was never maintained that one who was ousted of his seat in Congress on a contest could take the matter into the courts to supervise the action of Congress on such grounds as are alleged in this case. Yet the power of Congress, under the Constitution, in determining which of two claimants was in fact elected to a seat in that body, both being admittedly qualified, is, under the Constitution, just the same as the power of our General Assembly in determining a contested election for Governor and Lieutenant Governor.

It is earnestly argued that the General Assembly was wrong in its decision of this case, and that it is a very serious matter thus to overthrow the will of the people. Whether the Assembly was right or not in its decision, it is not our province to determine. But a much more important question is involved in the case, which is the integrity of our form of government as founded by our forefathers. If the action of the Legislature may be disregarded by the courts, then it is no longer an equal and independent branch of the government within its Constitutional jurisdiction, but the courts become the final depository of the supreme power of the State. Judicial tyranny is no less tyranny because couched in the forms of law. There was great wisdom in dividing the powers of a republic between three equal and independent sets of officers. One operates as a check upon the other, and no greater blow to the perpetuity of our institutions could be given than to destroy this check.

For these reasons we are of the opinion that the courts of this State are without authority to enter into the in-

quiry sought in this case, and that the journals of the
General Assembly are conclusive of the controversy.  The
judgment of the lower court, being in accordance with
these views, is therefore affirmed.

JUDGE BURNAM'S OPINION.

The general demurrer to the answer and amended an-
swer of contestees, which was sustained by the chancellor
in this proceeding, admits that on the 9th day of Decem-
ber, 1899, W. S. Pryor, as chairman and W. T. Ellis, as
member of the State board of election commissioners,
certified that William S. Taylor and John Marshall had
received the highest number of votes given for the offices
of Governor and Lieutenant Governor, respectively, and
were duly and regularly elected to fill these offices for the
term prescribed by the Constitution; that at the election,
under the operation of the statute know as the
"Goebel Election Law," the entire election machinery of
the State was in the hands of the friends and
partisans of contestants; that all of the elec-
tion officers, from the highest to the lowest, were selected
by the State Board of Election Commissioners, or by their
appointees; that the members of the State Board of Elec-
tion Commissioners were themselves fellow partisans of
contestants; that by the action of the election officers on
the day of the election contestees were illegally, and in
many cases fraudulently, deprived of a large number of
votes in the various voting precincts of the State; that,
subsequent to the election contestants had entered
into a conspiracy with divers members of the Leg-
islature to nullify this election of the people by
the institution of a fraudulent contest before them;
that, pursuant to this conspiracy so entered into,
the contest boards were selected by a fraudulent de-

vice, not by lot as required by law; that as a result of this
trick ten out of the eleven members selected for the trial
of the Governor's contest were partisans of the contest-
ant, and nine out of the eleven members selected as a con-
test board for the trial of the Lieutenant Governor's con-
test were partisans of the contestant; that a number of
the members of the General Assembly selected on both of
these contest boards were disqualified from sitting on the
ground that they had advised that such contest should be
made, and had promised to render them effective; that at
least one member of the board selected to try the contest
for the office of Governor had wagered money on the result
of the election; that the contest boards in the trial of the
contests had acted throughout in an illegal, tyrannical,
and arbitrary manner in the admission and rejection of
testimony, and in the whole conduct of the trial; that they
did not report to the General Assembly any of the testi-
mony which had been taken upon the trial; and that the
General Assembly, at the time they approved the deci-
sions of the contest boards, did not have a particle of tes-
timony before them, were not familiar with the facts, re-
fused to hear argument, held their alleged meeting at
which the contests were determined at a secret place with-
out the knowledge of either contestees, or more than one-
third of the entire membership of the General Assembly,
who were thereby excluded from any participation in the
action so taken at the time of the alleged determination
of the contests in favor of contestants. It is also admit-
ted that at the time the alleged action was taken by the
General Assembly on the 2d day of February, 1900, the
Legislature had been previously adjourned by the Gov-
ernor to meet in London, Ky. It is hard to imagine a
more flagrant and partisan disregard of the modes of pro-

cedure which should govern a judicial tribunal in the determination of a great and important issue than is made manifest by the facts alleged and relied on by contestees, and admitted by the demurrer filed in this action to be true; and I am firmly convinced, both from these admitted facts and from knowledge of the current history of these transactions, that the General Assembly, in the heat of anger engendered by the intense partisan excitement which was at that time prevailing, have done two faithful, conscientious, and able public servants an irreparable injury in depriving them of the offices to which they were elected by the people of this Commonwealth; and a still greater wrong has been done a large majority of the electors of this Commonwealth who voted under difficult circumstances to elect these gentlemen to act as their servants in the discharge of the duties of these great offices. But we are met at the threshold of this case with the contention that the courts of the State, under the limitations imposed by the Constitution have no power to go behind the legislative journals, and review the judgment of the General Assembly in a proceeding over which they are given, by the Constitution, exclusive jurisdiction, and from whose determination of the question no appeal is provided. The Constitution defines the duties and limits the powers of each of the three co-ordinate departments of government, and in the discharge of these duties and exercise of these powers each department must, of necessity, be independent of the other so long as they remain within the constitutional limitations, and, "no person or collection of persons being of one of these departments can exercise any power properly belonging to either of the others, except in the instances expressly directed or permitted." See sections 27 and 28 of the Constitution. By section 90 of

the Constitution the determination of contested elections
for the offices of Governor and Lieutenant Governor is
imposed upon the General Assembly, to be exercised in
accordance with such regulations as may be established
by law. Pursuant to this provision of the Constitution,
the Legislature has, in section 1531 and subsections there-
under of the Kentucky Statutes, prescribed the regula-
tions for their guidance in the determination of such con-
tested elections; and it appears from the exhibits filed with
the petition that the General Assembly have, pursuant to
these regulations, decided the contests for the offices of
Governor and Lieutenant Governor in favor of the con-
testants, and if no appeal or power to review their find-
ing is given to the courts by the Constitution, which is
the basis of all power both in the Legislature and in the
courts, their finding would seem to be conclusive of the
question. Similar questions to that at bar have been be-
fore this court in quite a number of cases, beginning with
the celebrated case of Batman v. Megowan, 1 Metc., (Ky.),
533, in which the opinion was written by one of the ablest
lawyers which ever adorned this bench; and after a careful
consideration of all of these cases, and numerous authori-
ties which have been cited from elementary writes and
courts of last resort in other States, I have been led with
some reluctance to the conclusion, and not without some
misgivings as to its correctness, that there is no power
in the courts of the State to review the finding of the Gen
eral Assembly in a contested election for the offices of
Governor and Lieutenant Governor as shown by its duly-
authenticated records. Many questions have been raised
and discussed with great ability by learned and eloquent
counsel for appellants, but it will be unnecessary for me

to consider them in view of the conclusion which I have reached on this fundamental question.

Judge Guffy: I concur in and adopt the foregoing as my view of the question involved.

JUDGE DuRELLE'S DISSENTING OPINION:

Since Kentucky has had a government, the powers of the government have been divided into three distinct departments, and each of them is confined to a separate body of magistracy, to-wit, those which are legislative to one, those which are executive to another, and those which are judicial to another. These departments are co-ordinate and co-equal. The magistracy of each department is confined to its own powers and duties. As a matter of course, and in the nature of things, these co-ordinate departments are in some respects interdependent. From the very nature of things it results that, while the legislative branch is supreme in saying what shall be law, and the executive in the execution of the laws enacted by the Legislature, the power must rest somewhere of saying whether those departments have exceeded their powers, or have assumed powers which properly and constitutionally belong to another department. Were the sections of the Constitution (27 and 28) the only ones which limited the powers of the departments, such inquiry and determination would be limited to the decision of whether any of the three departments had transgressed upon the domain of one of the others. But the Constitution contains other limitations, and contains also grants of power which are exceptions to the fundamental division of powers. One of these exceptions is the grant to the Legislature of power to determine contested elections for Governor and Lieuten-

ant Governor. In section 90 it is provided, "Contested elections for Governor and Lieutenant Governor shall be determined by both Houses of the General Assembly according to such regulations as may be established by law." This is a grant to one of the departments of power which under the general division would not belong to it. A contest is a litigation over a right. The decision of a litigation over a right claimed by one party and denied by another is, in its essence, judicial. In the absence of express grant of power to the members of the body of magistracy who constitute the legislative department, they could not exercise this power. Therefore, when power of this description, judicial in its essence, is, by the organic law, delegated to the members of that body of magistracy, there is no implication of a grant beyond the letter of the granting clause, except as to such matters as are of necessity implied in the grant, and essential to the execution of the power. But this grant is not merely a grant of power. It is a grant of power with express limitations. It endows the persons who constitute the body of magistracy to whom are confided legislative powers with an additional power taken from the judicial department, and by the terms of the grant subjected to two limitations. One limitation is made by the statement of the power which is granted. The grant is of power to determine contested election for these two offices. The word "contest" as used in Constitutions and statutes is a word of art having a well-defined meaning. It means a litigation between two parties who claim property or right. It carries with it distinctly the idea of a plaintiff, a defendant, and a thing in controversy. A contested election is a controversy between two over the question which one of them was elected,—which one of them received the high-

est number of legal votes at the election. That is a con-
test; and that, in the nature of things, is all that an elec-
tion contest can be. The second limitation in the grant is
that contested elections for these offices shall be deter-
mined by the grantees of this power "according to such
regulations as may be established by law." Accordingly
we find that regulations have been established by law reg-
ulating the procedure, and providing for pleadings. A
notice in writing must be given within a limited time, must
state the ground of contest, and none other shall be heard
as coming from such party. Section 1535, Kentucky Stat-
utes. This notice is the declaration or petition. The same
rule which applies to all other litigations applies to this.
An issue must be made, either by the law or by the plead-
ings of the parties. In this litigation it is provided that
it may be made in either way. A counter notice, equiva-
lent to an answer or plea, may be given, or if not given,
the law denies the averments of the declaration, and the
contestee may defend without actually filing a counter
notice. Other regulations of a procedure in determining
such a litigation are established by law, but they are not
material to the present discussion, except as they tend to
further illustrate the fact that this is a litigation before
a tribunal. In exercising the powers granted of determin-
ing this contest, the Legislature was a mere contest board
exercising powers granted with both express and implied
limitation, and powers which were not, in any sense, legis-
lative. The Legislature was, as to this matter, a tribunal
created by the Constitution to try a litigation. In the
exercise of this power, this tribunal was confined to the
jurisdiction, conferred. If it went beyond its jurisdiction,
its action was void; just as void as if it had undertaken to
grant a divorce in defiance of the constitutional inhibition,

or as would be the judgment of a county court to sell land
in Switzerland. Now comes the question, who can deter-
mine whether this contest board has exceeded its jurisdic-
tion, and upon what evidence of transgression can this de-
termination be made? In the nature of the government
it must be that this power rests with the courts, and with
the courts alone. Universally, it is conceded that this
power of determination, whether one of the departments
has gone beyond its jurisdiction as defined by the Con-
stitution, or has transgressed constitutional inhibitions
upon its exercise, rests with the courts. In arriving at
their determination upon a question of this kind, there is
much dispute as to what evidence the courts may consider,
and to what extent such evidence is conclusive upon them.
But, in the nature of the government, it is essential that
the power of determining whether constitutional limita-
tion have been transgressed is with the courts, and the
courts only. If the Governor issues an edict, and under-
takes to enforce it as law, the courts will declare it void.
If the Constitution limited his power of pardon to specific
cases and inhibited its exercise in others, the courts would
declare a pardon of one of the forbidden offenses void. It
has been reiterated so many times that the repetition is
wearisome that the courts will not lightly, nor in a doubt-
ful case, hold the action of a co-ordinate branch of the
government unconstitutional; but, on the other hand, it
has often been held that, when convinced that the Legis-
lature has exceeded its power,—has violated the inhibi-
tions of the Constitution,—or invaded the powers of co-
ordinate branches of government, no court will hesitate to
declare that the Legislature acted without jurisdiction, and
its action was unconstitutional and void; and this is done
as to matters purely legislative. But in this matter the

Legislature or its members are not acting as a Legislature. They are acting as a contest board. Now, if this contest board exceeds its jurisdiction, there can be no question of the power of the courts to inquire into the validity of its determination, and to say whether that determination—that judgment—was valid or void. Com. v. Jones, 10 Bush, 725.

In this case a suit is brought to recover an office, and as the basis for such recovery a record is relied upon, -- the record of a so-called "trial and determination" by the Legislature sitting as a contest board. Upon this record it is claimed that the contestant appears entitled to the office of Governor. What does the record show? It shows that the contestee was duly certified to have received the highest number of votes as shown by the returns, and was thereupon duly inducted into office. After his qualification, his title to the office was perfect. I do not care whether, after the notice of contest was given, it be said he was Governor *de jure* or Governor *de facto*. Until that notice was given, he was Governor by undisputed title. The record then shows that a notice of contest was given contesting the election, and claiming the office upon the ground that in the city of Louisville and some forty counties there was no legal election; that the election was void; that in the metropolitan city of the State, the equivalent in population and voters of thirty or forty counties of ordinary size, the election was void because of intimidation by the military, and interference by the judiciary, and no valid election was held there; that in some forty counties of the State the election was void because, in violation of the law, thin ballots were used. All other grounds alleged in the notice are merely cumulative to these, and the averment that the original contestant was

duly·elected is a mere deduction from the averment that the election in these counties was void. Now, if this be true,—and upon the verity and sufficiency of these averments the record stands,—there was no election in Kentucky, for the Constitution provides that the Governor shall be elected by the qualified voters of the State, and, if the declaration of notice in this record is true, the qualified voters of the State had no election, for somewhere in the neighborhood of 50 per cent. of the qualified voters of the State either had no opportunity to vote legally, or were intimidated from exercising the right of suffrage freely. The notice, therefore, in substance, alleges that there was no election in the State of Kentucky, and that, therefore, the contestant was entitled to the office. This is the fair construction of the language used in the notice. This is what the record relied on shows and this record and the judgment which was claimed to be rendered upon it is the basis of this litigation to secure the actual possession of the office. The record on which this suit is brought shows on its face that the question presented to the tribunal which rendered the decision was not one which it had jurisdiction to try. It had jurisdiction to try a contest. The only authority given to it was to try the question, which candidate received the highest number of votes. A contest board can not try the question whether there was an election, or whether an election was void. That is not for its consideration. The only question a board of contest has authority to try is, which of the two litigants received the highest number of legal votes cast? That question was not presented to it, and its action upon any other question was a nullity; as much a nullity as if it had undertaken to grant the contestant a divorce upon an averment that the election was

void. Where there is a lawful election in a part only of the territory over which the election should be held, the election is void in its entirety. People v. Salomon, 46 Ill., 415. See, also, Howes v. Perry, (Ky.), 17 S. W., 575. Now, if the election was void because it was not free and equal in the whole or any substantial part of the territory, because in any considerable extent of the territory the voters were prevented by intimidation of troops or judges from exercising freely their right of suffrage, because in any considerable extent of the territory the officers of election did not do their duty, and violated the requirements of the Constitution as to secrecy in the ballot, and thereby deprived the voters of the privilege of legally casting their votes, what tribunal can decide the question that there was no election? The most recent utterance of this court is the case of Hocker v. Pendleton, 100 Ky., 726, (39 S. W., 250). That case was a bill in equity to declare an election void because sufficient ballots were not furnished by the officers to enable all the voters to express their preferences, and therefore the election was not free and equal. The sole authority relied on by counsel who sought to have the election declared void was the case of Leeman v. Hinton, 1 Duv., 37. In the Hocker case this court held distinctly that a court of equity had the power to declare that there had been no election. The averments in the record relied on in this suit admit of the application of no other remedy. It is not a contested election. It is a litigation of the question whether there was an election or not. It is not a litigation over an office. It is a litigation to determine whether any office was filled by the people. Properly, this jurisdiction, as is abundantly shown by the cases of Leeman v. Hinton and Hocker v. Pendleton, belongs to courts of equity. Now,

it is true that in Wilson v. Hines, 99 Ky., 221; (35 S. W., 627), (37 S. W., 148), one division of this court held that, where an election tribunal decided that the law under which the election contested was held was unconstitutional, it was not exceeding its powers. This was a short cut to practically the same end, which might have been obtained by the proper procedure. The contest board decided the act under which the election was held to be unconstitutional, and dismissed the contestant's case. What it ought to have done was to refuse to act at all, upon the ground that no election had been held, for an election under an unconstitutional law is no election. When the case was appealed, the appeal should have been dismissed, for the proper procedure of the party who thought himself aggrieved was by mandamus to compel the election board to act. The practical result, however, was the same; and this court, in the subsequent appeal, affirmed the judgment of the circuit court. But in the Hocker case the court returned to the true doctrine that the question whether an election had been held at all, or whether the election attempted to be held was void, was a matter for courts of equity to determine, as has been the law of Kentucky for forty years, and was the undisputed law at the time the present Constitution was adopted by the people. It is objected that the Legislature is given plenary power to determine a contested election as to these two offices, and that, having determined it, no inquiry can be made into the regularity of the procedure. If section 90 had read, "Elections for Governor and Lieutenant Governor shall be determined by both Houses of the General Assembly," this would be a grant of plenary power, and there would be no question in this case except the question whether the action of the Legisla-

ture had been the exercise of arbitrary power, or had been taken as to the contestee without due process of law. But it is a power with limitations, given to a contest board. The question is not here presented whether the courts shall interfere to prevent the exercise of legislative power. It is a question whether that body, acting not as Legislature, but as a board of contest, has acted within its jurisdiction. In its delicacy as to invading the jurisdiction of the co-ordinate legislative branch of the government this court seems to me to have been somewhat over-nice. No question of the propriety or infamy of a legislative act has been suffered to resolve doubt of its constitutionality into certainty. Neither the criminal purpose of the present election law, nor its potential spawn of force and fraud, now realized, availed to engender anything beyond mild doubt of its constitutionality. But it should be remembered that, while the Legislature is co-ordinate and co-equal, the judiciary has rights also. It is also a co-ordinate and co-equal branch of the government, and should be a little jealous of its own rights; and one of the essential rights of the judiciary is its right and power not only to restrain itself within constitutional limitations, but to announce when other departments go beyond them; to say finally and authoritatively when either of the other branches of the government has exceeded its jurisdiction.

In my opinion, the record upon which the petition in this case is based shows on its face affirmatively that the board of contest had not jurisdiction of the matter which it undertook to try. It is not a mere defective notice. It excludes the possibility of jurisdiction. I think, therefore, that the demurrer to the answer should have been carried back to the petition, and sustained.

The brief time between the consultation and the delivery

of the opinion renders it impossible for me to discuss any of the questions involved in this case except the question of jurisdiction of the contest board, and that but briefly. There are many questions of grave interest which I should be glad to discuss if time permitted, notably the question whether the procedure described at length in the answer in this case afforded the contestee the due process of law guaranteed by the Federal Constitution, and the question whether the action of the contest board was the exercise of arbitrary power.

This action was carried on writ of error by the appellants to the Supreme Court of the United States and the judgment of this court affirmed, as per extract here added.

Taylor and Marshall v. Beckham, Nos. 1 and 2.

Error to the Court of Appeals of the State of Kentucky.
No. 603. Aruged April 30,—May 1, 1900, decided May 21, 1900.
Reported in 178 U. S. Reports on page 548 to 609.

MR. HELM BRUCE AND MR. W. O. BRADLEY FOR PLAINTIFFS IN ERROR. MR. JAMES P. HELM AND MR. KENNEDY HELM WERE ON THEIR BRIEF.

MR. LAWRENCE MAXWELL AND MR. LEWIS McQUOWN FOR DEFENDANT IN ERROR. MR W. S. PRYOR WAS ON THEIR BRIEF.

Syllabus of the opinion of Chief Justice Fuller found on page 548, vol. 178 U. S. Reports.

"By the Constitution and laws of Kentucky, the determination of contests of the election of Governor and Lieutenant Governor, is and for a hundred years, has been committed to the General Assembly of the Commonwealth."

"The Court of Appeals of Kentucky, decided that the courts had no power to go behind the determination of the General Assembly in such a contest, duly recorded in the journals thereof; that the office of Governor or Lieutenant Governor was not property in itself; and moreover, that under the Constitution and laws of the State of Kentucky, such determination being an authorized mode of ascertaining the result of an election for Governor and Lieutenant Governor, the persons declared elected to those offices on the face of the returns by the board of canvas-

Taylor, &c., v. Beckham, &c.

sers, only provisionally occupied them, because subject to the final determination of the General Assembly on contests duly initiated."

Held 1. "That the judgment of the Court of Appeals, to the effect that it was not empowered to revise the determination by the General Assembly adverse to plaintiffs in error, in the matter of election to these offices, was not a decision against a title, right, privilege or immunity secured by the Constitution of the United States; and plaintiffs in error could not invoke jurisdiction because of deprivation, under the circumstances of property or vested rights, without due process of law."

2. "That the guarantee of the Federal Constitution to each of the States, of a republican form of government, was intrusted for its enforcement to the political department, and could not be availed of, in connection with the 14th amendment, to give this court jurisdiction to revise the judgment of the highest court of the State that it could not review the determination of a contested election of Governor and Lieutenant Governor by the tribunal to which that determination was exclusively committed by the State Constitution and laws, on the ground of deprivation of rights secured by the Constitution of the United States."

"It results from the conclusions announced that the writ of error must be dismissed and it is so ordered."

"Mr. Justice McKenna filed a separate opinion but concurred in the result."

"Mr. Justice Brewer and Mr. Justice Brown concurred in a dissent for reasons stated in their dissent."

"Mr. Justice Harlan dissented for reasons stated in his dissent."