Affirming.
The appellee, plaintiff below, a citizen and taxpayer of this state, brought this action against the appellants, W.H. Shanks, auditor of public accounts of the Commonwealth of Kentucky, W.W. Mansfield, chief clerk of the Senate, and Charles Howes, chief clerk of the House of Representatives, to enjoin the auditor from issuing any warrant drawn on the treasury of this Commonwealth for payment to any person for acting as an officer or employee of the House of Representatives or the Senate except to those enumerated in section 249 of our Constitution, and to enjoin the respective clerks of the Senate and House from drawing on or receiving from the auditor or state treasury any sum or sums for such payment. From a judgment awarding the appellee such relief, the appellants bring this appeal.
The petition, as amended, in substance avers that the General Assembly of this Commonwealth now sitting did in January, 1926, by joint resolutions authorize the *Page 293 
Senate and the House to employ a number of employees in addition to those enumerated in section 249 of our Constitution to perform for these bodies certain services during the present session of the legislature and that pursuant to such joint resolutions the Senate and House had employed assistant doorkeepers, assistant enrolling clerks, assistant sergeants-at-arms, assistant cloak-room keepers, extra pages, stenographers, copyists, messengers and mail clerks not authorized by section 249 of our Constitution. The petition further avers that on February 1, 1926, the General Assembly adopted a joint resolution appropriating the sum of $7,000.00 for the current, contingent and necessary expenses of the present sitting of the House of Representatives, and the sum of $6,000.00 for the like expenses of the Senate, which resolution also directed the auditor to draw his warrants on the state treasury from time to time on requisition from the chief clerks of the respective bodies for the payment of such expenses so certified to him by these clerks. The petition then goes on to say that it was the purpose of the General Assembly, its chief clerks and the auditor to pay the extra help employed by the legislature as above mentioned out of this appropriation, and unless the appellants were enjoined as prayed, the clerks would issue their requisitions on the auditor for the pay of this extra help out of this appropriation and the auditor would issue his warrants for such pay on such requisitions. To this petition, the appellants interposed a special and general demurrer and on these being overruled, they declined to plead further and the judgment appealed from was thereupon entered.
It is with a due sense of the delicacy of the questions involved and the proprieties of the situation that we approach the consideration of this case. The General Assembly is a coordinate branch of our government and its determination as to its needs to properly function and perform its duties should not lightly be inquired into and should not be set aside except by reason of a clear and cogent constitutional mandate which it is the duty of all of us to obey. But if there be such a constitutional mandate, then we can do naught else but bow to its edict and enforce it according to its tenor.
The appellee, a citizen and taxpayer, insists that the respective bodies of the General Assembly are by section 249 of our Constitution expressly forbidden to elect, *Page 294 
appoint, employ or pay for any help other than that designated therein. This section reads:
 "The House of Representatives of the General Assembly shall not elect, appoint, employ or pay for, exceeding one chief clerk, one assistant clerk, one enrolling clerk, one sergeant-at-arms, one doorkeeper, one janitor, two cloak-room keepers, and four pages; and the Senate shall not elect, appoint, employ, or pay for, exceeding one chief clerk, one assistant clerk, one enrolling clerk, one sergeant-at-arms, one doorkeeper, one janitor, one cloak-room keeper, and three pages; and the General Assembly shall provide, by general law, for fixing the per diem or salary of all of said employees."
This section appears in that part of our Constitution called "General Provisions." In the constitutional convention of 1890, the original report of the committee on general provisions, of which the late Governor Wm. Goebel was chairman, does not seem to have contained this section. In the earlier part of the convention, when, sitting as a committee on the whole, it was considering the report of the legislative committee, it struck from that committee's report the following offered as one of the clauses of the proposed new Constitution:
 "The General Assembly shall have no power to appoint or elect any officers except such officers as are necessary for the organization and work of that body and United States senators."
The convention as such concurred in this action of itself as a committee on the whole. Debates of the Constitutional Convention, pp. 3916, 4314. The reason given for this action was the fear that it might be thought from the language that the General Assembly would have power, not only to appoint and elect its help, but also that of United States senators. But it is significant to note that the convention did have before it a clause which it could have modified to remove the objection stated and yet retain the power to appoint or elect such officers as were necessary for the organization and work of theGeneral Assembly, and that it failed to do so.
Later, when the report of the committee on general provisions was before the convention for action, we find *Page 295 
the following with reference to the constitutional provision here in question:
"The President: Report the next section.
 "The Clerk: It is that offered by the delegate from Simpson:
 "The House of Representatives of the General Assembly shall not elect, appoint or pay for exceeding one chief clerk, one assistant clerk, one enrolling clerk, one sergeant-at-arms, one doorkeeper, one janitor, two cloak-room keepers and four pages; and the Senate shall not elect, appoint, employ or pay for exceeding one chief clerk, one assistant clerk, one reading clerk, one enrolling clerk, one sergeant-at-arms, one doorkeeper, one janitor, one cloak-room keeper and three pages, and they shall provide, by general law, for fixing the per diem or salary of all such employes.
 "Mr. Harris: I offer that to stop, to some extent, some of the leaks in the treasury. The delegate from Todd has given this matter some investigation, and I yield my time to him.
 "Mr. Petrie: I had not expected to make any discussion of this section, but this is a question which was introduced at some early stage of the convention, and was discussed by one of the delegates. I believe it was either voted out or laughed out of the convention, I hardly know which; but there is merit in this proposition, although it may be a small one.
 "The President: If the same proposition has been voted on, the chair will hold it out of order.
 "Mr. Petrie: It was not the same, but similar. It will relieve, in my judgment, members of the General Assembly of considerable embarrassment hereafter. The habit has grown up from members, as I am told, and I believe it to be true, who have sons and kinspeople, to endeavor to get them in some office in the General Assembly, and a system of logrolling commences from the time the speaker is elected until they close. These officers have cost the people of the state a great deal more than some persons would suppose by casual observation.
 "When that discussion was up before there were some figures presented by the auditor. Take the last General Assembly. They employed ten clerks and eighteen pages. The clerks were paid *Page 296 
$13,410.00 and the pages were paid $7,500.00. The cost of these employes, as given by the auditor, was $30,955.00. Those were for persons who waited upon and attended upon the General Assembly. Every gentleman knows they were not necessary. Every gentleman knows that was twice as many employes as were necessary. They were in the way. We have been very liberal in this body, and we have rather a superabundance, and only have about half as many as attended the last General Assembly. I know it may be said with plausibility that the General Assembly ought to be left to regulate their own affairs, according to their judgment about what is right and proper; but if we fix this rule, we will save them a great deal of trouble and annoyance, when they know they can only employ so many. When this convention has fixed the number, they will be employed without the trouble of logrolling for those minor positions, and you will save at least $10,000.00 or $15,000.00 a year. Do the economists say that is a trivial matter, not to be considered at all? If we are entering upon a system of economy, why not start right here? Here is a place where we can cut off and do no harm, and where we can save the members of the General Assembly from very unpleasant annoyance.
 "Mr. Carroll: I move the previous question on the section.
 "A vote being taken, the main question was ordered.
"Mr. Burnam: I call the yeas and nays on that.
"Mr. Harris: I second the motion.
 "The result of the roll call was announced as follows: (Here is inserted the roll call, the totals being: Yeas 43, nays 30; absent 27), so the section was adopted.
 "The President: Without objection, the chair would like to explain his vote. From my experience in the legislative department I have seen times when it was utterly impossible for two secretaries or two clerks to do the business of the house.
"Mr. Funk: I would like to explain my vote.
 "The President: Without objection, that can be done.
 "Mr. Funk: If the new Constitution is adopted, that takes out all this local legislation, and I do not *Page 297 
think they need the same number of clerks they have had heretofore.
 "Mr. Pettit: I would like to explain my vote. I hesitated about voting for it, because it does not properly belong in the Constitution, but I have seen so much wrong perpetrated by reason of it, that I think it is a remedy which the people ought to have somewhere, and I do not know anywhere else."
Debates — Constitutional Convention, 1890, pp. 4921, et seq.
After the convention had adjourned and the Constitution had been adopted, the General Assembly in 1893 enacted the following sections of the statutes:
 "Section 1991. All of said employees shall receive a per diem, which shall be in full of all services rendered by them, and it shall be as follows: That of the chief clerk and assistant clerk, eight dollars ($8.00); that of the enrolling clerk, six dollars ($6.00); that of the sergeant-at-arms and doorkeeper, five dollars ($5.00); that of the janitor, four dollars ($4.00) that of the cloak-room keeper, three dollars ($3.00) and that of the pages, two dollars and fifty cents ($2.50)."
 "Section 1992. No other employees shall be elected, appointed, employed or paid for without the joint action of the two houses."
During the session of the legislature which adopted these sections of our statutes, the House of Representatives directed its clerk to employ some one to do some copying and engrossing as he and his assistants could not do. Pat McDonald was employed and performed services for which he claimed $1,149.50. The house passed a resolution directing the auditor to draw a warrant under what is now section 342, Kentucky Statutes, which reads:
 "The pay and mileage of the lieutenant governor, president pro tem. of the Senate, and speaker of the House of Representatives, and members of both houses of the General Assembly, the compensation to the officers of the two houses, except the chief clerks thereof, to be made on the certificate of the respective clerks of the amount due; the compensation of the chief clerks upon the order of each house, stating the amount due; all other contingent *Page 298 
expenses of the General Assembly, upon the production of the vouchers, countersigned by the clerks of the respective houses."
The action of the House on these matters was upheld by this court in McDonald v. Norman, 95 Ky. 593, 26 S.W. 808, wherein we said that the claim was a part of the contingent expense account of the House of Representatives coming within the purview of section 342 of the statutes above quoted. Section 249 of the Constitution was neither cited, referred to nor considered in this case.
In 1896, during the session of the General Assembly of that year, one Walker was elected by the Senate as a porter and performed the duties required of him. In his petition, to which a demurrer was sustained, Walker stated that due to the great political excitement prevailing at that time, the work needful to keep the chambers clear and make fires therein could not be done by the usual force of employes; that the work he performed was temporary and not usually necessary at the stated sessions of the Senate and that the expense for such work was a contingent expense of that body payable as authorized by section 342 of the statutes. This court in Walker v. Coulter, Auditor, 113 Ky. 814, 68 S.W. 1108, upheld the lower court's refusal to grant Walker the mandamus requested to compel the auditor to issue his warrant for Walker's claim for pay which had been duly certified to the auditor by the chief clerk of the Senate. In this case, after quoting section 249 of the Constitution, we said:
 "The object of this provision was to prevent the creation of a number of small offices to be filled by the Senate and the consequent electioneering and loss of time of the Senate in filling them, and to provide offices to be filled by responsible men, to whom the General Assembly might allow a compensation sufficient to permit the employment of ample assistants."
The McDonald case supra was then taken up and discussed and we concluded that in the light of section 249 of the Constitution it "was incorrectly decided and would doubtless not have been so decided had the attention of the court been called to the constitutional provision." Sections 1988-1992 of the Kentucky Statutes were then quoted, and in as much as Walker had not *Page 299 
been employed by a joint resolution of the House and Senate, we said:
 "This is decisive of the question before us, even if we treat section 249 of the Constitution as inapplicable because of the decision of this court in the McDonald case, in which its existence was not referred to. This is an express statute passed subsequent to the allowance of the claim therein considered, which forbids exactly the thing here sought to be done."
In 1908, during the session of the legislature of that year, Mrs. Emma. Guy Cromwell, our present secretary of state, was employed by the chief clerk of the Senate as a copyist to copy bills, resolutions and other papers necessary to be copied. Her claim was duly certified to the auditor by the chief clerk of the Senate and when the auditor refused to issue his warrant therefor, Mrs. Cromwell brought a mandamus suit to compel him to do so on the theory that her claim was a contingent expense coming within section 342 of the statutes. The lower court granted her the relief she sought, but on appeal to this court, this judgment was reversed in James, Auditor v. Cromwell,129 Ky. 508, 112 S.W. 611. In this case, speaking through Judge. Lassing, and after quoting section 249 or the Constitution, we said:
 "This section of the Constitution is clearly a limitation upon the right or power of either the House or Senate to hire officers and employes. It was evidently passed for the purpose of preventing either body from creating needless offices at the expense of the state. . . . It is evident that the makers of the Constitution intended that all the work of the legislative bodies should be performed by the officers and employes as defined by section 249, above referred to. And it may be presumed that in designating the names and numbers of such employes the constitutional convention was fully advised; for, in addition to having among its members men of broad experience in the conduct of the affairs of both House and Senate, it had access to the public records showing the number of employes that had theretofore been required. That they did so is made manifest by their express declaration that neither body should pay for the services of any employe other than those designated in section 249. *Page 300 
It could hardly be contended that the chief clerk had authority to do that which the Senate itself is expressly prohibited from doing.
 "It is urged that work of the character which was performed by appellee was absolutely necessary in order that the business of the Senate might be expeditiously carried on. This argument would address itself most forcibly to the legislature as a reason why the Constitution should be amended so as to give to the respective legislative bodies more employes than those designated in section 249, if it should be found necessary to have such employes in order to properly conduct its business. Such an argument, however, has no place, and cannot be considered, here. Again, it is urged that these services should be paid for as a contingent expense of the Senate. We cannot agree with learned counsel that an employment of this character could be paid for as a contingent expense; for, if one copyist could be so employed and paid, the number could be multiplied ad libitum, and the very purpose and aim of the constitutional provision defeated."
After pointing out that the McDonald case supra was practically overruled in the Walker case supra, and after quoting section 1992 of the statutes, we further said:
 "So that, even if it should become necessary for either house to have the services of additional employes, before they could be legally employed, a joint resolution to that effect would have to be passed, if section 1992 is constitutional, which is not now decided."
These three cases are the only ones which have been cited to us or which we have been able to find bearing on the construction to be given to section 249 of our Constitution.
In the light of them and of the debate in the convention on the adoption of this section as a part of our fundamental law, it is very clear that the purpose of section 249 was to forbid the employment of any help by the General Assembly other than that designated in that section. Nothing that we could here say would serve to elucidate that purpose more clearly, tersely or aptly than the debate in the convention we have quoted, and the *Page 301 
reasoning of this court in the Walker and Cromwell casessupra. It was thought by the convention that the help authorized by section 249 would be ample for any possible need thereafter of either house of the General Assembly and although the lapse of time and march of progress have demonstrated that the convention was mistaken in this, yet this argument as said in the Cromwell case goes to the amending of section 249 rather than the ignoring of it.
But it is urged that section 249 when fairly construed does not forbid the employment of help other than that designated therein if the employment be by joint resolution or election of the two bodies; that it simply forbids the respective houses from electing, appointing, employing or paying for such extra help; and that the Walker and Cromwell cases expressly left this question open. That these cases did leave this question open is true, but the answer to it was clearly foreshadowed in both of them. The main purpose of the section was economy. It may have turned out to be false economy but false or true, economy was its main purpose. As said in the Cromwell case: "It it evident that the makers of the Constitution intended that all the work of the legislative bodies should be performed by the officers and employes as defined by section 249." To hold that the assembly by joint resolution or election could do what the Walker and Cromwell cases said neither body acting separately could do would defeat these purposes of the section as thus proclaimed by the convention and the court. Further, section 34 of the Constitution provides:
 "The House of Representatives shall choose its speaker and other officers, and the Senate shall have power to choose its officers biennially."
This section clearly provides that in the selection of the officers of the House and Senate, the respective bodies shall choose and elect their own officers independently of each other. Joint action is not authorized. And this was the reason why nothing was said in section 249 about joint action in the selection of the officers. It had already been provided that each body should choose its own officers; hence there was no need of this latter section to forbid the employment of extra help by a joint resolution or election when officers could not by reason of this previous section be elected jointly. Section 249 itself *Page 302 
recognizes the mandate of section 34, for while dealing with each body of the General Assembly separately when forbidding extra help, it requires the House and Senate to act together as the General Assembly in fixing the pay of the help authorized. It thus recognizes that while each body must select its own officers, yet the General Assembly as such must fix their pay — concert of action in the latter respect, separate action in the former. Nor can it be urged that a joint resolution may authorize the employment of extra help to be filled by election or appointment by the respective bodies, for such resolution would then serve to empower such bodies to do exactly what section 249 says they cannot do. To illustrate: It will no doubt be conceded that a joint resolution or act of the General Assembly could not create the office of assistant sergeant-at-arms to the House, said office to be filled by the governor or by joint action of the two bodies of the legislature, because section 34 of the Constitution provides that each house shall choose its own officers. But if to avoid this constitutional objection such joint resolution should provide that the office so created should be filled by the House acting alone, then we would be confronted with section 249, which says that the House shall not elect, appoint, employ or pay for any officers except those designated therein. It results, therefore, that such resolution or act must be invalid. A resolution, joint or otherwise, cannot rise higher than the inhibition of a constitutional mandate.
Therefore, as the employment of extra help cannot in the light of section 249 of the Constitution be authorized by resolution, joint or several, of the respective bodies of the General Assembly, payment for such help cannot be made as a contingent expense under section 342 of the statutes. This is concluded by the Walker and Cromwell cases, which hold that an employment forbidden by section 249 of the Constitution cannot be sustained as a contingent expense under section 342 of the statutes.
But it is urged by the appellants that to sustain the judgment of the lower court would be to impeach the joint resolution of February 1, 1926, which does nothing but appropriate the sum of $13,000.00 for the contingent expenses of both houses of the General Assembly and says nothing about help, officers or employees, extra or otherwise. It scarcely needs authority to sustain the *Page 303 
proposition that an engrossed bill or resolution of the General Assembly duly signed by its presiding officers and approved by the governor, as was the resolution of February 1, 1926, may not be impeached by the journals of either house or otherwise. Nor can we, were we so inclined, which we are not, having the proper respect due a coordinate branch of our government, inquire into the motives of the General Assembly in enacting such laws as it has or question its wisdom in so doing. Taylor v. Beckham, 108 Ky. 278, 56 S.W. 177; Vogt v. Beauchamp,153 Ky. 64, 154 S.W. 393; Craig v. O'Rear, 199 Ky. 553,251 S.W. 828. We are quite mindful of our position in the scheme of government and have no desire or purpose to go beyond it. But the question is not whether the resolution of February 1, 1926, may be impeached, for of course it may not, but whether it is impeached by the judgment of the lower court. In Webster's New International Dictionary, "impeach" is thus defined:
 "To bring or throw discredit on; to call in question; to challenge; to impute some fault or defect to."
We thus see that to impeach an act or resolution means to bring discredit on it, to impute some fault or defect to it. Neither the pleadings nor the judgment bring any discredit on the resolution of February 1, 1926, or impute to it as such any fault or defect. The petition simply avers that it is the intention of the House, the Senate, their clerks and the auditor to pay the extra help authorized and employed by resolutions other than this one of February 1, 1926, out of the appropriations made by this resolution of February 1, 1926, which fact the general demurrer of appellant admits. Neither the petition nor the judgment questions the power or authority of the General Assembly to provide for its contingent expenses, nor do either of them question the validity of the appropriations of February 1, 1926, for such contingent expense. All they do is to question and forbid, respectively, the payment of this extra help as a contingent expense out of this valid appropriation for contingent expense. The appropriation for the contingent expense is not questioned. That is all the resolution of February 1, 1926, does. But the payment of extra help as a contingent expense is questioned. Manifestly the judgment affects in no wise the resolution of February 1, 1926. It does not declare it invalid. As long as it stands, there *Page 304 
is an appropriation to the extent of the amounts authorized for the contingent expenses of the General Assembly. But it is admitted by the demurrer that the respective bodies, their clerks, and the auditor will pay out of this valid appropriation an expense as a contingent expense not authorized by law. These unauthorized expenses were and are not created by the resolution of February 1, 1926, but by the resolutions authorizing the employment of the extra help. It is these which are declared invalid and not the resolution of February 1, 1926. It is no more impeached than the general revenue laws of the Commonwealth which have raised the funds out of which it is proposed to make the appropriations to pay this extra help. Therefore, there is no merit in this contention which was urged as a basis for the special demurrer.
From the foregoing considerations, it results that the judgment of the lower court enjoining, in substance, the payment of this extra help is correct. We have arrived at this conclusion with regret. We fully realize that the growth of this Commonwealth since the adoption of the present Constitution, the development of its natural resources, the expansion of its mineral production, the increasing importance of its manufactories, have all brought in their train numerous and perplexing problems, most of which call for the serious attention of and solution by the legislative body. With the growth of business, the need of help to dispatch it necessarily increases. No one who is acquainted with the immense amount of detail work which now confronts our legislative bodies can help but admit the need, at least in part if not in its entirety, of the extra help provided for in these resolutions. It is to be regretted that the constitutional convention in its wisdom did not foresee our material growth and expansion and did not, at least in this particular, leave a freer rem to the General Assembly. But regrets or no, it did not and there is naught else for us to do until the people by their sovereign will change that instrument but to abide in letter and in spirit by the mandates of the Constitution.
The judgment of the lower court is therefore affirmed.
Whole court sitting and concurring. *Page 305